# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT CINCINNATI

| | | |
|---|---|---|
| **JAMES E. KOLENICH,** | : | Case No. 1:19-cv-00153-MRB |
| | : | |
| Plaintiff, | : | Judge Michael R. Barrett |
| | : | |
| vs. | : | **MOTION TO DISMISS OF** |
| | : | **GANNETT SATELLITE** |
| **GANNETT SATELLITE INFORMATION** | : | **INFORMATION NETWORK, INC.** |
| **NETWORK, INC.,** | : | **D/B/A CINCINNATI ENQUIRER** |
| | : | |
| Defendant. | | |

Defendant Gannett Satellite Information Network, Inc. d/b/a Cincinnati Enquirer ("The Enquirer"), moves this Court for an order dismissing Plaintiff James E. Kolenich's ("Plaintiff" or "Kolenich") Complaint (Doc. 1) pursuant to Fed. R. Civ. P. 12(b)(6), with prejudice.

Respectfully submitted,

*/s/* John C. Greiner
**John C. Greiner** (0005551)
**Darren W. Ford** (0086449)
*Trial Attorneys*

*Of Counsel:*

| | |
|---|---|
| GRAYDON HEAD & RITCHEY LLP | GRAYDON HEAD & RITCHEY LLP |
| 312 Walnut Street | 312 Walnut Street |
| Suite 1800 | Suite 1800 |
| Cincinnati, OH 45202 | Cincinnati, OH 45202 |
| Phone: (513) 629-6464 | Phone: (513) 629-2734 |
| Fax: (513) 651-3836 | Fax: (513) 333-4316 |
| | Email: jgreiner@graydon.law |
| | dford@graydon.law |

ATTORNEYS FOR GANNETT SATELLITE INFORMATION NETWORK, INC. D/B/A CINCINNATI ENQUIRER

1

**MEMORANDUM IN SUPPORT**

**I.   INTRODUCTION**

Plaintiff believes it is important to "oppose Jewish influence in society" and that "white people are the chosen people in the New Testament." (Monroe Trombly Declaration, Ex. A; Phil Didion Declaration, Ex. A.) He refers to the Second Vatican Council as "Vatican Jew," and complains that "[y]ou can't call the Jew Holocaust into question," because "[t]he most important event in human history is [Jesus Christ's] Resurrection, not, this Jewish Holocaust even if it did happen." (Trombly Dec., Ex. A; Didion Dec., Ex. A.) He is also vehemently opposed to "mass, uncontrolled, un-white immigration," and fears that immigrants are "going to turn [America] into the Third World that they left." (Trombly Dec., Ex. A; Didion Dec., Ex. A.)

Plaintiff shared these views and others with Enquirer reporter Monroe Trombly in a video interview conducted on February 15, 2018.  The interview focused on Plaintiff's legal representation of a dozen neo-Nazis and white supremacists facing criminal charges arising out of their involvement in the "Unite the Right" rally that took place in Charlottesville, Virginia in August 2017.

On February 26, 2018, The Enquirer published a story based on the interview under the headline: "In a suburban Cincinnati office park, white nationalists have found their lawyer – and an ally" (hereinafter "Article"). The Article later appeared in substantially the same form in the print edition of The Enquirer on March 4, 2018 under the headline: "Lawyer defends, echoes white nationalists.'"

Plaintiff brings suit against The Enquirer for defamation and false light, claiming that The Article falsely accused him of being "in agreement with the political views of his Virginia

2

clients," and part of the "alt-right," a "loose affiliation of racists, white nationalists, and anti-semites [sic]." (Doc. 1 at PAGEID #: 4, at ¶¶ 18-22; Trombly Dec., Ex. A at 1.) In other words, Plaintiff bases his suit on his disagreement with The Enquirer's characterization of his views as being consistent with individuals who identify as members of the "alt-right." He further complains that he was presented in a false light because his views, which he claims are based on his "religious beliefs," were interposed with the opinions of others who criticized his views as anti-Semitic and offensive. (Doc. 1 at PAGEID #: 4, at ¶ 26.)

Plaintiff does not, however, deny that he made any of the statements attributed to him in the Article. And like Plaintiff's statements about the need to oppose "Jewish influence on society," and the alleged harms of "un-white immigration," The Enquirer's characterization of those views as consistent with, or similar to views held by members of the so-called "alt-right" is fully protected by the First Amendment of the United States Constitution, and Section 11, Article I of the Ohio Constitution. Accordingly, because Plaintiff has failed to state a claim on which relief may be granted, The Enquirer respectfully requests that the Court dismiss his Complaint with prejudice.

## II. BACKGROUND

### A. Complaint Allegations[1]

Plaintiff alleges that he is an attorney in private practice in the Cincinnati, Ohio area, and that he "specializes in civil rights litigation." (Doc. 1 at PAGEID #: 2, at ¶¶ 8-9.) He describes himself as a "Traditional [sic] Roman Catholic," and that "[t]raditional Roman Catholics take

---

[1] For purposes of a motion under Fed. R. Civ. P. 12(b)(6), the allegations in the complaint must be taken as true. By reciting Plaintiff's allegations, the Gannett Defendants neither admit, nor waive their right to challenge the alleged facts through any subsequent answer or otherwise.

3

notice of, and appropriate religious action in response to, serious theological problems with the modern, post 1950s Roman Catholic Church." (*Id.*at ¶ 7.)

Sometime after August 2017, Plaintiff alleges he was retained to represent "several parties in various courts located in Virginia" stemming from their involvement in "a political rally in Charlottesville, Virginia." (*Id.* at PAGEID #: 2-3, ¶¶ 10-12.) He alleges that his "Virginia clients are often referred to as 'white supremacists', 'nazis' [sic] and so forth." (*Id.* at PAGEID #: 2-3, ¶ 13.)

On February 26, 2018, The Enquirer published an article on Cincinnati.com under the headline "In a suburban Cincinnati office park, white nationalists have found their lawyer – and an ally" (previously defined as the "Article").[2] (*Id.* at PAGEID #: 3, ¶ 17; Trombly Dec., Ex. A.) The Article later appeared in substantially the same form in the print edition of The Enquirer on March 4, 2018 under the headline "Lawyer defends, echoes white nationalists." (*Id.* at PAGEID #: 3, ¶ 16; Trombly Dec., Ex. B.) Prior to the Article's publication, Kolenich sat for an on-camera interview with the reporter who authored the Article, Monroe Trombly. (*Id.* at PAGEID #: 3, ¶¶ 20, 23; Didion Dec., Ex. A.)

In the Article, Plaintiff is described as having made the following statements to The Enquirer:
- "My willingness to get involved is to oppose Jewish influence in Society."
- "It's plain that white people are the chosen people in the New Testament.

---

[2] The Article (both online and print versions) and Kolenich's on-camera interview are expressly referenced in the Complaint, and are both central to Plaintiff's claims for defamation and false light. Accordingly, the Article and video may properly be considered by the Court on a motion to dismiss under Fed. R. Civ. P. 12(b)(6) without converting the motion to one for summary judgment. *See Greenberg v. Life Ins. Co.*, 177 F.3d 507, 514 (6th Cir. 1999). *See also Hazime v. Fox TV Stations*, *Inc.*, No. 12-15072, 2013 U.S. Dist. LEXIS 116909, at **3-4 (E.D. Mich. Aug. 19, 2013) (holding that Court could consider two television broadcasts for purposes of motion to dismiss defamation claim based on those broadcasts).

> It's the *job* that we were given, to spread Christianity around the world. That doesn't involve hatred of other races, not even of ethnic Jews. But it does involve opposing their un-Christian influence in society."

- "[Kolenich] said he got involved in this case because he believes some Jewish people are dead set on destroying America and turning it into a Third-World country thanks to 'mass, uncontrolled, un-white immigration.'"

- "The last such council was Vatican II or as we call it, Vatican Jew."

- "If you're going to let them all (immigrants) come up here, their problems are going to come with them, they're not going to magically get Americanized . . . They're going to turn it into the Third World that they left."

- If being Christian is equated with being a neo-Nazi in this society, then that's just how it has to be . . . It' [sic] (being a Nazi) is something that I would reject, all things being equal, but there's nothing I can do about it in modern society."

- "You can't call the Jew Holocaust into question, right? . . . How many millions, tens of millions of Russians were slaughtered during the Soviet Union… you never hear about it right? Don't want to talk about it. Just the magic six million. So Christians really shouldn't fall for that. The Holocaust is the execution, the crucifixion of Christ. The most important event in human history is His Resurrection, not, this Jewish Holocaust even if it did happen."

- "They're not going to stop marching . . . They're not going to stop pushing their political beliefs no matter what happens, and the government can not stop them."

(Trombly Dec., Ex. A.) Plaintiff does not plead that The Enquirer falsely attributed these statements to him.

Despite having made these statements, Plaintiff alleges that The Enquirer falsely stated that "he was in agreement with the political views of his Virginia clients." (Doc. 1 at PAGEID #: 3, at ¶ 18.) He alleges that The Enquirer accomplished this by "intentionally" juxtaposing his "explanation of his Virginia clients [sic] political positions with [his] own religious beliefs." (*Id.*

5

at ¶ 19.) He also alleges that The Enquirer "falsely" stated that "Plaintiff represents his Virginia clients because his views align, at least in part, with those client's [sic] political views" and that Kolenich is "part of a 'loose affiliation of racists, white nationalists, and anti-semites [sic]'." (*Id.* at PAGEID #: 4, at ¶¶ 21-22.) He claims that The Enquirer made these statement with knowledge that they were false, and that Plaintiff did not say or do anything "that a reasonable person could have interpreted as justifying a claim of membership in any loose affiliation of racists." (*Id.* at ¶ 24.)

In addition to these allegedly false statements, Kolenich claims that The Enquirer "omitted, paraphrased, or buried Plaintiff's religious statements under a mountain of anti-Christian symbolism and statements by persons other than Plaintiff, that has the overall effect of making it appear, falsely, that Plaintiff is attempting to use religious belief as an excuse for irreligious hatred and bigotry." (*Id.* at ¶ 26.) He claims that the presentation of his on-camera interview in the Article was a "'calculated falsehood' that was designed to, and did, place the plaintiff before the public in a 'false light.'" (*Id.* at PAGEID #: 5, at ¶ 28.)

Plaintiff claims that as a result of the Article, he has suffered, and continues to suffer, humiliation, embarrassment, anxiety, mental anguish, emotional distress, and damage to his reputation and career. (*Id.* at PAGEID #: 5-6, at ¶ 35.) In his prayer for relief, Plaintiff seeks monetary damages in an amount in excess of $75,000, as well as punitive damages, costs, reasonable attorney's fees, and prejudgment interest. (*Id.* at PAGEID #: 6.)

    **B.**     **Procedural Posture**

Plaintiff filed his Complaint on February 26, 2019. (Doc. 1.) The Enquirer was served with the Complaint and Summons on March 22, 2019, and now timely files its Motion to

Dismiss pursuant to Fed. R. Civ. P. 12(b)(6).

### III. ARGUMENT

#### A. Rule 12(b)(6) Motion to Dismiss Standard of Review

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Kiser v. Kamdar*, 831 F.3d 784, 787 (6th Cir. 2016) (internal quotations omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (internal quotations omitted).

#### B. Plaintiff has failed to state a claim for defamation as a matter of law.

To state a claim for defamation under Ohio law, a plaintiff must prove five elements: "'(1) that a false statement of fact was made, (2) that the statement was defamatory, (3) that the statement was published, (4) that the plaintiff suffered injury as a proximate result of the publication, and (5) that the defendant acted with the requisite degree of fault in publishing the statement.'" *See Boulger v. Woods*, Nos. 18-3170/3220, 2019 U.S. App. LEXIS 5841, at **11-12 (6th Cir. Feb. 27, 2019) (quoting *Susan B. Anthony List v. Driehaus*, 779 F.3d 628, 632-33 (6th Cir. 2015)). "Under Ohio law, it is for the court to decide as a matter of law whether certain statements alleged to be defamatory are actionable or not." *Boulger*, 2019 U.S. App. LEXIS 5841, at *11 (internal quotations omitted).

Expressions of opinion are protected under both the First Amendment to the United States Constitution, and Section 11, Article I of the Ohio Constitution. The Ohio Constitution provides "absolute immunity from liability for expressions of opinion," and thus establishes a higher bar than the First Amendment. *See Boulger*, 2019 U.S. App. LEXIS 5841, at *24

(Nalbandian, J. concurring in part and in the judgment) (citing *Vail v. Plain Dealer Pub'g Co.*, 72 Ohio St. 3d 279, 1995-Ohio-187, 649 N.E.2d 182, 185 (Ohio 1995)).

### 1. The Enquirer's statements are protected opinion under Section 11, Article I of the Ohio Constitution.

For purposes of Ohio law, "in determining whether a statement constitutes protected opinion or actionable fact, courts should consider the totality of the circumstances, including facts such as: (1) the specific language used; (2) whether the statement is verifiable; (3) the general context of the statement; and (4) the broader context in which the statement appeared." *Boulger*, 2019 U.S. App. LEXIS 5841, at *12 (internal quotations omitted). In applying the test, the Ohio Supreme Court has explained that "[t]he weight given any one factor under this inquiry will vary depending on the circumstances of each case," and that "[w]hile necessarily imperfect, these factors assist in discerning as systematically as possible what constitutes an assertion of fact and what is, in contrast, an expression of opinion." *Wampler v. Higgins*, 93 Ohio St. 3d 111, 126, 2001-Ohio-1293, 752 N.E.2d 962, 977 (internal quotations and original formatting omitted).

In *Vail*, the plaintiff—a candidate for the Ohio Senate—sued the Cleveland Plain Dealer and the individual author of a column that appeared in the paper for statements about her campaign. 72 Ohio St. 3d at 279. In the column, which was published under the caption "commentary" and entitled "Gay-basher takes refuge in the closet," the author stated that the plaintiff "doesn't like gay people" and that she "has added gay-bashing to the repertoire of right-wing, neo-numbskull tactics she is employing . . . in her increasingly distasteful campaign . . ." *Id.* (internal quotations omitted). The author also characterized comments the plaintiff had made as an "anti-homosexual diatribe," and claimed that the plaintiff "wouldn't be the first candidate to latch onto homophobia as a ticket to Columbus." *Id.* The author further accused the plaintiff of "hate-mongering" and added that he did not "have much use for bigots of any sort." *Id.* at 279-

280. Applying the four-part totality of the circumstances test, the *Vail* court held that none of the statements in the column were actionable, and affirmed the trial court's order dismissing the plaintiff's claims for defamation and intentional infliction of emotional distress.

Applying the totality of the circumstances test to the statements Kolenich relies on to support his claims for defamation dictates the same result.

> **a. The specific language used in the Article on which Plaintiff bases his defamation claim does not have a precise meaning so as to give rise to clear factual implications.**

Under the first factor, the Court must determine "whether the allegedly defamatory statement has a precise meaning and thus is likely to give rise to clear factual implications." *Wampler*, 93 Ohio St. 3d at 127-28 (internal quotations omitted). "A classic example of a statement with a well-defined meaning is an accusation of a crime, whereas statements that are loosely definable or variously interpretable cannot in most contexts support an action for defamation." *Id.* (internal quotations and citations omitted). In applying this test, the *Wampler* court cited approvingly of a Second Circuit Court of Appeals decision, in which that court held that an accusation that a columnist was a "fellow traveler" of "fascists" was not actionable because it was "susceptible of widely different interpretations." *Id.* at 129 (citing *Buckley v. Littell*, 539 F.2d 882 (2d Cir. 1976)).

Plaintiff bases his defamation claim on three statements: (1) that he "was in agreement with the political views of his Virginia clients" (Doc. 1 at PAGEID #: 3, at ¶ 18); (2) that he "represents his Virginia clients because his views align, at least in part, with those client's [sic] political views" (*Id.* at PAGEID #: 4, at ¶ 21); and (3) that he "is part of a 'loose affiliation of racists, white nationalists, and anti-semites [sic].'" None of these statements can be reduced to a precise meaning giving rise to factual implications.

First, these statements are similar in tone and tenor to the statements at issue in *Vail*, which the court held could "hardly be defined with crystal clarity." 72 Ohio St. 3d at 283. As the *Vail* court explained with respect to the statements that the plaintiff had engaged in "an anti-homosexual diatribe" and fostered "homophobia," such statements "conjures a vast array of highly emotional responses that will vary from reader to reader." *Id.* (internal quotations omitted). The statements at issue here, like those in *Vail*, are not similar "to the typical examples of punishable criminal or disciplinary conduct cited as actionable language." *Id.*

Also instructive is the reasoning of Second Circuit in *Buckley*, in which that court explained that "the use of 'fascist,' 'fellow traveler' and 'radical right' as political labels . . . cannot be regarded as having been proved to be statements of fact, among other reasons, because of the tremendous imprecision of the meaning and usage of these terms in the realm of political debate . . ." 539 F.2d at 893. The *Buckley* court further explained:

> [A]llegations of membership or well-defined political affiliation are readily perceivable as allegations of fact susceptible to proof or disproof of falsity. They are quite dissimilar to the terms "fellow traveler," "fascism" and "radical right" which, whether as used by [the defendant] or as perceived by a reader, are concepts whose content is so debatable, loose and varying, that they are insusceptible to proof of truth or falsity.

*Id.* at 894.

The Article does not accuse Kolenich of being a member of a neo-Nazi group, the Klu Klux Klan, or any other well-defined hate group. To the contrary, the Article specifically points out that the Southern Poverty Law Center did not list him as a member of a hate group. (Trombly Dec., Ex. A.) Rather, the Article simply opines that Kolenich is a "new name in the *pantheon* of the 'alt-right,' a *loose affiliation* of racists, white nationalists, and anti-Semites." (*Id.* (emphases added).) Thus, the Article itself indicates that the term "alt-right" is not capable of precise definition, showing that it is nothing more than an imprecise term used "in the realm of political

debate."

                            **b.    The statements on which Plaintiff bases his defamation claim are not verifiable.**

The second factor asks "whether an allegedly defamatory statement is verifiable." *Wampler*, 93 Ohio St. 3d at 129. For this inquiry, the Court must determine "whether the allegedly defamatory statements are objectively capable of proof or disproof . . ." *Id.* As the rationale for this factor, the Ohio Supreme Court has explained that "[a]n obvious potential for quashing or muting First Amendment activity looms large when juries attempt to assess the truth of a statement that admits of no method of verification." *Id.* (internal quotations omitted).

As an initial matter, the statement that Plaintiff was "in agreement with the political views of his Virginia clients" stems from Kolenich's own statement to The Enquirer, and specifically, that his "willingness to get involved [in defending his Virginia clients] is to oppose Jewish influence in society." (Trombly Dec., Ex. A.) Plaintiff does not plead in his Complaint that his Virginia clients—described in the article as "neo-Nazis and white supremacists"—do not share his desire to "oppose Jewish influence in society." The question is therefore, how would Plaintiff prove that he does not share this view with his Virginia clients?

Plaintiff seems to argue that his reason for wanting to oppose "Jewish influence" is rooted in his Christianity, whereas his Virginia clients' desire to oppose "Jewish influence" is the product of some other motivation. But the Article specifically states that Kolenich's views on "Jewish influence" are the product of his "traditional Roman Catholic" views, and that Kolenich characterizes his Virginia clients as "godless heathens." (Trombly Dec., Ex. A.) Thus, the alleged difference in "motivations" is disclosed in the Article itself.

More important, in applying this factor of the test, the Sixth Circuit in *Boulger* explained that "a non-verifiable statement would be one that refers to an individual's 'internal motivation'

11

because no plausible method to confirm the veracity exists." 2019 U.S. App. LEXIS 5841, at *18. Here, there is no plausible method to verify why Plaintiff wishes to "oppose Jewish influence on society" and compare that with the motivations behind his Virginia clients' desire to do the same. Thus, any statement in the Article that suggests Kolenich's motivations for wanting to "oppose Jewish influence on society" are the same as those of his Virginia clients—assuming that the Article suggests such a statement—is not verifiable for purposes of the second factor of the test.

Plaintiff's allegation that the Article states that Kolenich is "part of" the "alt-right," is likewise unverifiable. The Article itself characterizes the "alt-right" as a "loose affiliation," i.e., no formal membership exists. Thus, being called part of the "alt-right," at least by the Article's own description of that term, is akin to being called a "fellow traveler" in a "fascist" movement—accusations the Second Circuit held were not susceptible to proof of falsity. *See Buckley*, 539 F.2d at 894. Accordingly, this statement is likewise not capable of verification for purposes of the second factor of the test.

     c. **The general and broader context of the alleged statements show that they constitute non-actionable expressions of opinion.**

The Sixth Circuit analyzes the third and forth factors of the test together. *See Boulger*, 2019 U.S. App. LEXIS 5841, at *19 (citing *Bentkowski v. Scene Magazine*, 637 F.3d 689, 695 (6th Cir. 2011)). Under these factors, "[t]he general context is analyzed to determine 'the larger objective and subjective context of the statement, so that the alleged defamatory statements are not examined in isolation." *Boulger*, 2019 U.S. App. LEXIS 5841, at *19 (internal quotations and original formatting omitted).

The Article as a whole focuses on Plaintiff's motivations for representing his Virginia clients, who the Article describes as "neo-Nazis and white supremacists." The Article is replete

with quotes of statements Kolenich made about his own views and his reasons for wanting to get involved in the case. A reasonable reader of the Article would thus understand that characterizing Kolenich's views as "alt-right" was the writer's characterization of those views, i.e., an expression of opinion.

The same is true for any implication in the Article that Plaintiff was in agreement with the views of his Virginia clients. Plaintiff expressed opinions about "Jewish influence," "un-white immigration," and the Holocaust. The Article, once again, simply characterizes these views as those held by the "alt-right," which the Article defines as a "loose affiliation of racists, white nationalists and anti-Semites." The assertion that Plaintiff's views are racist and anti-Semitic is clearly an expression of opinion by The Enquirer (even though it seems beyond reasonable dispute that Plaintiff's statements meet the dictionary definitions of those terms).[3] Indeed, Plaintiff's own disagreement with the characterization of his views as racist and anti-Semitic proves the point (assuming Plaintiff deems himself to be a reasonable person).

In sum, the test factors all weigh in favor of the conclusion that the statements on which Plaintiff bases his claim for defamation constitute protected opinion under Section 11, Article I of the Ohio Constitution, and are therefore not actionable as a matter of law. The Court should therefore dismiss Plaintiff's defamation claim with prejudice.

C. **Plaintiff fails to state a claim for false light as a matter of law.**

Plaintiff also pleads a claim for false light invasion of privacy under Ohio law. (Doc. 1 at PAGEID #: 5, at ¶¶ 26-28.) The Ohio Supreme Court has defined the tort as follows:

> One who gives publicity to a matter concerning another that places the

---

[3] *See* Merriam-Webster.com, "anti-Semitism," https://www.merriam-webster.com/dictionary/anti-Semitism (last visited April 9, 2019) (defining anti-Semitism as "hostility toward or discrimination against Jews as a religious, ethnic, or racial group") & *Id.* "racism," https://www.merriam-webster.com/dictionary/racism (last visited April 9, 2019) (defining racism as "a belief that race is the primary determinant of human traits and capacities and that racial differences produce an inherent superiority of a particular race").

> other before the public in a false light is subject to liability to the other for invasion of privacy, if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

*Welling v. Weinfeld*, 113 Ohio St. 3d 464, 2007-Ohio-2451, 866 N.E.2d 1051, ¶ 58. Like defamation, the statement on which the false light claim is based must be "untrue." *Welling*, 113 Ohio St. 3d 464, 2007-Ohio-2451, 866 N.E.2d 1051, ¶ 52. Thus, "constitutionally protected statements of opinion not susceptible of a determination as to their trust or falsity" cannot be the basis of a false light claim. *Roe v. Heap*, No. 03AP-586, 2004-Ohio-2504, ¶ 106 (10th Dist. May 11, 2004).

Plaintiff alleges that The Enquirer "omitted, paraphrased, or buried Plaintiff's religious statements under a mountain of anti-Christian symbolism and statements by persons other than Plaintiff, that has the overall effect of making it appear, falsely, that Plaintiff is attempting to use religious belief as an excuse for irreligious hatred and bigotry." (Doc. 1 at PAGEID #: 4, at ¶ 26.) In other words, Plaintiff alleges that the Article falsely portrays his motivations for making the statements about "opposing Jewish influence on society," the harms of "un-white immigration," and the Holocaust, on non- or anti-religious motivations, rather than "the religious points that Plaintiff had actually expressed." (*Id.* at PAGEID #: 5, at ¶ 34.)

Plaintiff's reliance on an alleged false statement regarding his motivations for making the statements quoted in the Article is fatal to his false light claim, as Plaintiff's motivations for making the statements are not susceptible to verification. *See Boulger*, 2019 U.S. App. LEXIS 5841, at *18 ("a non-verifiable statement would be one that refers to an individual's 'internal motivation' because no plausible method to confirm the veracity exists"). Thus, there is no way for Plaintiff to demonstrate that the alleged statement is false.

Moreover, Plaintiff pleads no facts to support the conclusion that a reasonable person reading the Article would find his statements about Jewish people and "un-white immigrants" to be less offensive because his views are the product of his religious beliefs, rather than "irreligious hatred or bigotry." Indeed, a reasonable person would have no way of knowing one way or the other why Plaintiff really holds those views, only that he does, in fact, hold them.

Accordingly, because Plaintiff cannot show that he was presented in a false light due to a verifiably false statement in the Article about his motivations for expressing his views about Jewish people and immigrants, Plaintiff's false light claim fails as a matter of law.

### IV. CONCLUSION

For the reasons set forth above, The Enquirer respectfully request that the Court **GRANT** its Motion to Dismiss and dismiss the Complaint with prejudice.

*Of Counsel:*

GRAYDON HEAD & RITCHEY LLP
312 Walnut Street
Suite 1800
Cincinnati, OH 45202
Phone: (513) 629-6464
Fax: (513) 651-3836

Respectfully submitted,

*/s/* John C. Greiner
**John C. Greiner** (0005551)
**Darren W. Ford** (0086449)
*Trial Attorneys*
GRAYDON HEAD & RITCHEY LLP
312 Walnut Street
Suite 1800
Cincinnati, OH 45202
Phone: (513) 629-2734
Fax: (513) 333-4316
Email: jgreiner@graydon.law
         dford@graydon.law

ATTORNEYS FOR GANNETT SATELLITE INFORMATION NETWORK, INC. D/B/A CINCINNATI ENQUIRER

9423229.3